**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

JERMEL SOLOMON,

*Plaintiff,*

v.

**CASE NO.:**

FRANK GAY SERVICES, LLC d/b/a FRANK GAY COMMERCIAL SERVICES,

*Defendant.* /

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Jermel Solomon files this action against his former employer, Defendant Frank Gay Services, LLC d/b/a Frank Gay Commercial Services ("**Defendant**") as follows:

## INTRODUCTION

1. Plaintiff is a Black man and a disabled U.S. Army veteran who was a highly skilled and well-performing plumber while working for Defendant.

2. During his employment, Plaintiff was involved in an incident where a White customer screamed racial epithets and violently attacked him. Following his report of discrimination, Defendant threatened Plaintiff, denied him a promotion for which he was qualified, selected a White applicant for the position, and subjected Plaintiff to adverse treatment after he formally complained about race discrimination.

3. This is an action for discrimination and retaliation because of race and disability and failure to provide reasonable accommodations. 42 U.S.C. § 1981, Title

VII of the Civil Rights of 1964 ("**Title VII**"), the Americans with Disabilities Act ("ADA"), and the Florida Civil Rights Act ("**FCRA**").

**PARTIES, JURISDICTION AND VENUE**

4. Plaintiff is a resident of Winter Haven, Florida.

5. Defendant is a Delaware limited liability company with its principal place of business in Florida.

6. Plaintiff was an "employee" within the meaning of Title VII, the ADA, and the FCRA at all times relevant to this Complaint.

7. Defendant was an "employer" within the meaning of Title VII, the ADA, and the FCRA at all times relevant to this Complaint.

8. This Court has subject matter jurisdiction over Plaintiff's claims arising under 42 U.S.C. § 1981, the ADA, and Title VII pursuant to 28 U.S.C. § 1331.

9. This Court has supplemental jurisdiction over Plaintiff's related claims under the FCRA pursuant to 28 U.S.C. § 1367 because those claims form part of the same case or controversy as Plaintiff's federal claims.

10. This Court has personal jurisdiction over Defendant because Defendant maintains its principal place of business and continuously conducts substantial business within this District.

11. Venue is proper in this district because Defendant is subject to personal jurisdiction in this District and because the acts and omissions complained of herein occurred in this District. *See* 28 U.S.C. § 1391.

12. On or about June 12, 2026, Plaintiff timely filed a Charge of Discrimination alleging discrimination because of race, disability, and retaliation against Defendant with the United States Equal Employment Opportunity Commission ("EEOC"). This charge was dual-filed with the Florida Commission on Human Relations.

13. On June 22, 2026, the EEOC issued Plaintiff a Determination and Notice of Rights to Sue authorizing Plaintiff to institute a civil action against Defendant.

## GENERAL ALLEGATIONS

14. Plaintiff is a Black man.

15. Defendant provides commercial plumbing, inclusive of service and underground plumbing, and other facility-maintenance services throughout Florida. Service plumbing requires more direct interaction with commercial and residential customers, while underground plumbing is more job-site focused and involves substantially less customer interaction.

16. Defendant hired Plaintiff as an Underground Plumber in October 2024.

17. Defendant's management staff knew that Plaintiff was a disabled veteran at the time of his hire and at all times throughout his employment.

18. Plaintiff has been diagnosed with post-traumatic stress disorder ("**PTSD**"), anxiety, depression, injuries to both knees and feet, back and shoulder injuries, and multiple traumatic brain injuries. Plaintiff's mental impairments substantially limit his ability to interact with others, including customers, and to work in highly customer-facing environments.

19. During Plaintiff's interview with Underground Crew Supervisor Sean Handy ("**Sup. Handy**"), Plaintiff disclosed his disabilities and explained that, because of his resulting limitations, he needed to work in underground plumbing rather than the more customer-facing service-plumbing position. Defendant granted that request and assigned Plaintiff to work as an Underground Plumber.

20. Plaintiff subsequently provided Sup. Handy with additional details concerning his disabilities and limitations. Plaintiff successfully performed the essential functions of the Underground Plumber position with this accommodation from approximately October 2024 through July 2025.

21. On March 12, 2025, Plaintiff began working on an assignment at Valrico Mobile Home Park. While Plaintiff was working there, a customer began berating him and demanding that he leave the property.

22. The customer called Plaintiff a "black motherfucker", "a black piece of shit" and told him "fuck you, you nigger" while he was working on the assignment.

23. Plaintiff tried to move away from the customer and deescalate the situation, but the customer charged at him and assaulted him.

24. That same day, Plaintiff reported to his direct supervisor, Sup. Handy, that a customer had subjected him to explicit racial slurs and physically assaulted him while he was performing his assigned work. Rather than supporting Plaintiff or addressing the racially motivated incident, Sup. Handy told Plaintiff that he "may lose his job for being so stupid."

25. After Plaintiff reported the assault, a representative of Valrico Mobile Home Park thanked him for contacting law enforcement and informed him that the assailant had previously been a problem tenant.

26. In approximately June 2025, Plaintiff learned that Defendant was seeking to fill the Underground Crew Supervisor position. He spoke with Paul Wright, a White Operations Manager ("**Ops. Mgr. Wright**"); Greg Griffin, a White supervisor ("**Mgr. Griffin**"); and John Navarro, a White Service Manager ("**Mgr. Navarro**"), and advised them that he wanted to be considered for the position.

27. During Plaintiff's conversation with Mgr. Navarro, Mgr. Navarro acknowledged that Plaintiff possessed the requisite experience and told Plaintiff that he would speak with Ops. Mgr. Wright and Sup. Griffin about the position.

28. On or about July 2, 2025, Defendant selected Joshua Barber, a White man, for the Underground Crew Supervisor position and introduced Barber to Plaintiff as his new supervisor.

29. Mgr. Wright and Sup. Griffin told Plaintiff that he "wasn't what they were looking for" in the Underground Crew Supervisor position.

30. On the same day, Jordan Jackson, a Black Operations Support Specialist and who worked in Defendant's office asked Plaintiff to meet him in an area where Defendant did not have surveillance cameras.

31. Jackson told Plaintiff that, even though Plaintiff was overqualified for the Underground Crew Supervisor position, Defendant denied him the promotion because of his race. Jackson further stated that other Black employees faced similar

barriers to advancement and told Plaintiff not to wait before seeking employment with another company.

32. Plaintiff asked Jackson to prepare a written statement attesting to Plaintiff's strong performance. Jackson agreed to do so but stated that a written statement would not help because one couldn't "do that straight up to these people, we have to do it another way" and reiterated that because he (Jackson) is Black, his "word goes as far as a rock thrown in a lake" with Defendant.

33. On July 3, 2025, Plaintiff submitted a formal written complaint with Kitty Vega, Defendant's Director of Human Resources ("**HR Dir. Vega**"). He detailed that he had experienced race discrimination, including the denial of advancement opportunities, retaliation, and unsafe working conditions while working for Defendant. HR Dir. Vega called Plaintiff and acknowledged receiving of the complaint.

34. Approximately one week later, Plaintiff met with HR Dir. Vega and William LNU, Defendant's OSHA Safety Manager ("**Mgr. William**"), to discuss Plaintiff's race discrimination and workplace safety concerns.

35. HR Dir. Vega informed Plaintiff that management had spoken with other Black employees who stated they were comfortable at work and that Defendant did not intend to take further action regarding his discrimination complaints.

36. During the meeting, Mgr. William, a White man, advised Plaintiff that, as a "Part-Indian minority", he had never witnessed or experienced any racial

discrimination while working for Defendant and did not believe that it was occurring against Plaintiff.

37. HR Dir. Vega then apologized to Plaintiff for Mgr. William's comment and asked if he wanted to make a formal report regarding it.

38. Plaintiff explained that due to his past experiences with reporting racial discrimination and Defendant's lack of response, he did not want to do so.

39. In July 2025, Defendant removed Plaintiff from his accommodated underground-plumbing assignment and transferred him to service plumbing despite Defendant's knowledge that underground plumbing accommodated Plaintiff's disability-related limitations.

40. Defendant initially indicated that its underground-plumbing operations were being disbanded or substantially reduced. Defendant nevertheless continued performing and assigning underground-plumbing work.

41. Defendant knew that transferring Plaintiff to service plumbing would place him in a substantially more customer-facing position that conflicted with the disability-related limitations he had disclosed to Sup. Handy.

42. The transfer would reduce Plaintiff's available working hours and earning opportunities, thereby reducing his compensation.

43. When Plaintiff attempted to object to the transfer during a meeting attended by management, Human Resources, and coworkers, Sup. Griffin yelled at him for being "difficult."

44. Barber told Plaintiff that his next meeting "would be bad" if Plaintiff continued expressing his concerns.

45. On August 20, 2025, Plaintiff submitted medical documentation from his medical provider to Defendant requesting medical leave until September 5, 2025.

46. On or about August 23, 2025, Defendant sent representatives to Plaintiff's home and required him to empty his assigned work vehicle so it could be assigned to another employee.

47. Shortly after Plaintiff requested medical leave, HR Dir. Vega told him that there would be "no guarantee" that his job would still be available when he returned.

48. Defendant never approved the full period of Plaintiff's requested medical leave and did not engage in any meaningful discussion concerning accommodation of Plaintiff's disability. Instead, Plaintiff was required to use approximately five days of accrued paid time off, which did not cover the entire medically recommended period of absence.

49. Defendant did not ask Plaintiff for additional medical information, discuss whether the requested finite leave would enable him to return to work, or propose any alternative accommodation for the remainder of the requested leave period.

50. As a result of the racial discrimination, retaliation, refusal to engage in the interactive process or honoring Plaintiff's requested reasonable accommodations, Plaintiff believed that he had no choice but to resign on August 26, 2025.

**COUNT I – VIOLATION OF 42 U.S.C. § 1981 (RACE DISCRIMINATION)**

51. Plaintiff repeats and realleges Paragraphs 1 through 50 as if fully set forth herein.

52. Plaintiff is Black and a member of a class protected by § 1981.

53. Plaintiff possessed the experience and qualifications necessary for the Underground Crew Supervisor position and successfully performed his duties as an Underground Plumber throughout his employment.

54. Despite Plaintiff's qualifications and successful performance, Defendant discriminated against him by denying him the Underground Crew Supervisor promotion because of his race.

55. Defendant impaired Plaintiff's contractual employment relationship and interfered with his enjoyment of its benefits, privileges, terms, and conditions by, among other things, being yelled at and reprimanded by Sup. Handy after reporting racial slurs and denying Plaintiff the Underground Crew Supervisor promotion and selecting Joshua Barber, a White man, despite Plaintiff's qualifications and management's knowledge that Plaintiff sought the position.

56. But for Plaintiff's race, Defendant would not have engaged in the same conduct.

57. By discriminating against Plaintiff because of his race, Defendant denied Plaintiff the same right to enjoy the benefits, privileges, terms, and conditions of contracts as is and was enjoyed by non-Black citizens, in violation of the Civil Rights Act of 1866 (42 U.S.C. § 1981).

58. Defendant acted with malice or with reckless indifference to Plaintiff's federally protected rights. Defendant's management knowingly countenanced or approved of the racial discrimination, as exhibited by, among other things, Defendant's failure to take corrective action in response to Plaintiff's complaints of race discrimination.

59. As a direct and proximate result of Defendant's conduct, Plaintiff has suffered and will continue to suffer damages including emotional distress, humiliation, loss of dignity, loss of income and benefits, and other damages.

60. Plaintiff is entitled to compensatory and punitive damages, to the fullest extent permitted by 42 U.S.C. § 1981.

**COUNT II – VIOLATION OF 42 U.S.C. § 1981 (RETALIATION)**

61. Plaintiff repeats and realleges Paragraphs 1 through 50 as if fully set forth herein.

62. Section 1981 protects employees from retaliation for opposing race discrimination that interferes with contractual rights protected by § 1981.

63. Plaintiff engaged in protected activity beginning on March 12, 2025, when he reported and opposed racially motivated harassment and assault that occurred while he was performing work assigned by Defendant.

64. Immediately after Plaintiff reported the racially motivated assault, Sup. Handy threatened that Plaintiff "may lose his job for being so stupid."

65. Plaintiff again engaged in protected activity on July 3, 2025, when he submitted a formal written complaint expressly alleging race discrimination, hostile treatment, and racially disparate barriers to advancement.

66. Shortly after Plaintiff submitted his complaint, Defendant subjected him to materially adverse actions that would dissuade a reasonable employee from opposing unlawful race discrimination. Among other things, Defendant continued and intensified its scrutiny and monitoring of Plaintiff, continued its efforts to remove him from underground plumbing, adversely affected his work assignments, and placed his hours and earning opportunities at risk. Defendant's management also threatened and intimidated Plaintiff when he continued raising concerns about his treatment. But for Plaintiff's complaint of race discrimination, Defendant would not have subjected him to these materially adverse actions.

67. By retaliating against Plaintiff because of his protected activity, Defendant interfered with Plaintiff's enjoyment of the benefits, privileges, terms, and conditions of contracts as is and was enjoyed by non-Black citizens, in violation of Plaintiff's rights under the Civil Rights Act of 1866 (42 U.S.C. § 1981).

68. As a result of Defendant's discrimination against Plaintiff, Plaintiff felt that he had no other choice but to resign from his position.

69. Defendant acted with malice or with reckless indifference to Plaintiff's federally protected rights. Defendant's management knowingly and directly countenanced or approved of the retaliation against Plaintiff.

70. As a direct and proximate result of Defendant's conduct, Plaintiff has suffered and will continue to suffer, damages including emotional distress, humiliation, loss of dignity, loss of income and benefits, and other damages.

71. Plaintiff is entitled to compensatory and punitive damages, to the fullest extent permitted by 42 U.S.C. § 1981.

**COUNT III – VIOLATION OF TITLE VII (RACE DISCRIMINATION)**

72. Plaintiff realleges and incorporates paragraphs 1 through 50 as if fully set forth herein.

73. Plaintiff is Black and therefore a member of a protected class under Title VII.

74. Plaintiff possessed the experience and qualifications necessary for the Underground Crew Supervisor position and successfully performed his duties as an Underground Plumber.

75. Defendant subjected Plaintiff to adverse employment actions because of his race when it, among other things, denied him the Underground Crew Supervisor promotion and selected Joshua Barber, a White man, for the position despite Plaintiff's qualifications and management's knowledge that Plaintiff sought the promotion.

76. Plaintiff's race was a motivating factor in Defendant's decision to deny him the promotion and select Barber for the Underground Crew Supervisor position.

77. Defendant would not have denied Plaintiff the promotion and selected Barber but for Plaintiff's race.

78. As a direct and proximate result of Defendant's unlawful discrimination, Plaintiff has suffered and continues to suffer lost wages, lost benefits, loss of career

opportunities, emotional distress, humiliation, inconvenience, reputational injury, and other compensable damages.

79. Defendant acted with malice or reckless indifference to Plaintiff's federally protected rights, entitling Plaintiff to punitive damages under Title VII.

**COUNT IV – VIOLATION OF TITLE VII (RETALIATION)**

80. Plaintiff repeats and realleges Paragraphs 1 through 50 as if fully set forth herein.

81. Title VII prohibits an employer from retaliating against an employee because the employee opposed an employment practice made unlawful by Title VII.

82. Plaintiff engaged in activity protected by Title VII beginning on March 12, 2025, when he reported and opposed racially motivated harassment and assault that occurred while he was performing work assigned by Defendant.

83. Immediately after Plaintiff reported the racially motivated assault, Sup. Handy threatened that Plaintiff "may lose his job for being so stupid."

84. Thereafter, Defendant subjected Plaintiff to additional materially adverse treatment, including pressure to accept service-plumbing assignments and threats when he continued raising workplace concerns.

85. Plaintiff again engaged in protected activity on July 3, 2025, when he submitted a formal written complaint expressly alleging race discrimination, hostile treatment, and racially disparate barriers to advancement.

86. Shortly after Plaintiff submitted his complaint, Defendant subjected him to materially adverse actions that would dissuade a reasonable employee from opposing

unlawful race discrimination. Among other things, Defendant subjected Plaintiff to increased scrutiny and monitoring, adversely changed his work assignments, continued and intensified its efforts to remove him from underground plumbing, and placed his hours and earning opportunities at risk. Defendant's management also threatened and intimidated Plaintiff when he continued raising concerns about his treatment. But for Plaintiff's complaint of race discrimination, Defendant would not have subjected him to these materially adverse actions.

87. By subjecting Plaintiff to materially adverse actions because he reported and opposed race discrimination, Defendant retaliated against Plaintiff in violation of Title VII, 42 U.S.C. § 2000e-3(a).

88. As a result of Defendant's discrimination against Plaintiff, Plaintiff felt that he had no other choice but to resign.

89. Defendant acted with malice or reckless indifference to Plaintiff's federally protected rights. Defendant's management knowingly and directly countenanced or approved the retaliation against Plaintiff.

90. As a direct and proximate result of Defendant's conduct, Plaintiff has suffered and will continue to suffer damages, including emotional distress, humiliation, loss of dignity, loss of income and benefits, and other damages.

91. Plaintiff is entitled to compensatory and punitive damages, to the fullest extent permitted by Title VII.

**COUNT V – VIOLATION OF FCRA (DISCRIMINATION)**

92. Plaintiff realleges and incorporates paragraphs 1 through 50 as if fully set forth herein.

93. Plaintiff is Black and therefore a member of a protected class under the FCRA.

94. Plaintiff possessed the experience and qualifications necessary for the Underground Crew Supervisor position and successfully performed his duties as an Underground Plumber.

95. Defendant subjected Plaintiff unlawful discrimination because of his race when, among other things, he was reprimanded for reporting racial misconduct by a client and subjected to increased scrutiny after doing so, and when it denied him the Underground Crew Supervisor promotion and selected Joshua Barber, a White man, for the position despite Plaintiff's qualifications and management's knowledge that Plaintiff sought the promotion.

96. Alternatively, Defendant would not have denied Plaintiff the promotion and selected Barber but for Plaintiff's race.

97. As a direct and proximate result of Defendant's unlawful discrimination, Plaintiff has suffered and continues to suffer lost wages, lost benefits, loss of career opportunities, emotional distress, humiliation, inconvenience, reputational injury, and other compensable damages.

98. Defendant acted with malice or reckless indifference to Plaintiff's protected rights, entitling Plaintiff to punitive damages under the FCRA.

**COUNT VI – VIOLATION OF FCRA (RETALIATION)**

99. Plaintiff repeats and realleges Paragraphs 1 through 50 as if fully set forth herein.

100. The FCRA prohibits an employer from retaliating against an employee because the employee opposed an employment practice made unlawful by the FCRA.

101. Plaintiff engaged in activity protected by the FCRA beginning on March 12, 2025, when he reported and opposed racially motivated harassment and assault that occurred while he was performing work assigned by Defendant.

102. Immediately after Plaintiff reported the racially motivated assault, Handy threatened that Plaintiff "may lose his job for being so stupid." Thereafter, Defendant pressured Plaintiff to accept service-plumbing assignments and threatened him if he continued raising his concerns.

103. Plaintiff again engaged in protected activity on July 3, 2025, when he submitted a formal written complaint expressly alleging race discrimination, hostile treatment, and racially disparate barriers to advancement.

104. Shortly after Plaintiff submitted his complaint, Defendant subjected him to materially adverse actions that would dissuade a reasonable employee from opposing unlawful race discrimination. Among other things, Defendant subjected Plaintiff to increased scrutiny and monitoring, adversely changed his work assignments, continued and intensified its efforts to remove him from underground plumbing, and placed his hours and earning opportunities at risk. Defendant's

management also threatened and intimidated Plaintiff when he continued raising concerns about his treatment.

105. But for Plaintiff's complaint of race discrimination, Defendant would not have subjected him to these materially adverse actions.

106. By subjecting Plaintiff to materially adverse actions because he reported and opposed race discrimination, Defendant retaliated against Plaintiff in violation of the FCRA.

107. As a result of Defendant's discrimination against Plaintiff, Plaintiff felt that he had no other choice but to resign.

108. Defendant acted with malice or reckless indifference to Plaintiff's rights protected by the FCRA. Defendant's management knowingly and directly countenanced or approved the retaliation against Plaintiff.

109. As a direct and proximate result of Defendant's conduct, Plaintiff has suffered and will continue to suffer damages, including emotional distress, humiliation, loss of dignity, loss of income and benefits, and other damages.

110. Plaintiff is entitled to compensatory and punitive damages, to the fullest extent permitted by the FCRA.

## COUNT VII – VIOLATION OF THE ADA (FAILURE TO PROVIDE REASONABLE ACCOMMODATION)

111. Plaintiff repeats and realleges Paragraphs 1 through 50 as if fully set forth herein.

112. Plaintiff was a qualified individual with disabilities within the meaning of the ADA.

113. Defendant knew of Plaintiff's disabilities and resulting limitations, and Plaintiff could perform the essential functions of his position with reasonable accommodation.

114. Plaintiff informed Defendant that his disability-related limitations made extensive customer interaction difficult and requested assignment to underground plumbing rather than service plumbing because underground work involved materially less customer interaction. Defendant granted the request, and Plaintiff successfully performed the essential functions of the Underground Plumber position with that accommodation from approximately October 2024 through July 2025.

115. In approximately July 2025, Defendant removed Plaintiff from his accommodated underground-plumbing assignment and transfer him to service plumbing. Plaintiff objected and informed Defendant that underground plumbing accommodated his disability-related limitations.

116. Thereafter, Defendant subjected Plaintiff to additional materially adverse treatment, including pressure to accept service-plumbing assignments and threats when he continued raising workplace concerns.

117. On August 20, 2025, Plaintiff submitted documentation from his medical provider stating that he required leave for mental-health-related reasons and advising that he refrain from working from August 19 through September 5, 2025, with a projected return date of September 6, 2025.

118. Defendant did not approve the full period of medically necessary leave. Instead, Defendant required Plaintiff to use approximately five days of accrued paid time off, which did not cover the entire medically recommended absence, and did not offer unpaid leave or another effective accommodation for the remaining period.

119. Shortly after Plaintiff requested leave, Defendant's Director of Human Resources told him there was no guarantee his job would remain available when he returned. Approximately three days after receiving his medical documentation, Defendant required Plaintiff to surrender his assigned work vehicle so that it could be reassigned to another employee.

120. Plaintiff's underground-plumbing assignment and granting his finite medical-leave request were reasonable accommodations that would not have imposed an undue hardship. By failing to provide reasonable accommodations for Plaintiff's known disabilities, Defendant violated 42 U.S.C. §§ 12112(a) and 12112(b)(5)(A).

121. As a direct and proximate result of Defendant's unlawful conduct, Plaintiff suffered lost wages and benefits, emotional distress, humiliation, inconvenience, loss of dignity, and other damages. Plaintiff is entitled to compensatory and punitive damages, back pay, prejudgment interest, reasonable attorneys' fees and costs, and all other available legal and equitable relief.

## REQUEST FOR RELIEF

122. Plaintiff respectfully request that the Court enter judgment in his favor as follows:

A. Back pay, lost benefits, front pay, and other economic damages arising from Defendant's respective violations of 42 U.S.C. § 1981, Title VII, the ADA and the FCRA;

B. Compensatory damages for emotional distress, mental anguish, humiliation, inconvenience, loss of dignity, reputational injury, and other intangible injuries from Defendant's respective violations of 42 U.S.C. § 1981, Title VII, the ADA and the FCRA;

C. Punitive damages to the fullest extent permitted under 42 U.S.C. § 1981, Title VII, the ADA and the FCRA;

D. Pre-judgment and post-judgment interest;

E. An award of costs and reasonable attorneys' fees; and

F. Such other relief as this Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: September 18, 2026

Respectfully submitted,

By: *_/s/ Christopher S. Prater_*

Christopher S. Prater
**LEAD COUNSEL**
Florida Bar No.: 105488
cprater@pollardllc.com

Jonathan E. Pollard
Florida Bar No.: 83613
jpollard@pollardllc.com

**Pollard PLLC**
500 East Broward Blvd., #950
Fort Lauderdale, FL 33394
Telephone: 954-332-2380
Facsimile: 866-594-5731
*Attorneys for Plaintiff*